And we recognize our colleague, Judge Nygaard, who's with us through the miracle of modern communications technology. Can you hear us OK, Judge Nygaard? I can hear you well, Judge Jordan. Thank you. OK, thanks. All right. Then we'll call our first case and our only case for argument this afternoon. In Re Penn East Pipeline Company. Mr. Fuggenbaum? Mr. Jeremy Fuggenbaum for appellants. I'd like to reserve three minutes of my time for rebuttal. Thank you, Your Honor. May it please the court. The district court erred in holding that the Natural Gas Act grants private parties the ability to, quote, stand in the shoes of the sovereign and file lawsuits against the states. That was wrong for two independently sufficient reasons. First, Congress lacks the power to grant a private parties the right to sue the states. OK, we're familiar with your briefing argument. So let's jump into the questions, OK? What what is different today than in the past when, as your opponents point out, New Jersey didn't raise this argument for decades? There were condemnation actions and New Jersey didn't say, hey, wait a second, we're sovereign. Is that first, is that historically accurate? And if it is historically accurate, does that kind of longstanding approach tell us something about the way we should be interpreting the constitutional provision at issue? Your Honor, I'll take that in two parts, the premise and then if the conclusion follows. The premise, we're not disputing that New Jersey has allowed condemnation actions in the past for pipelines that were acting under the Natural Gas Act, including where the pipeline may have run through state properties or areas affected by state easements. But we don't think that that's constitutionally significant and we don't think it's significant as a matter of NGA interpretation, which are the two questions before the court. It's not constitutionally significant because the question, as the Supreme Court has made clear, is whether or not the states consented at the founding to this sort of abrogation of their state sovereign immunity. Right. And I'm not suggesting that you consented to it in the 60s and 70s and therefore in the 2000s and the teens. But I am asking whether that kind of course of conduct should inform what is the reasonable interpretation of the 11th Amendment in the argument you're making to us. So I don't think it can for two reasons. First, because the evidence is susceptible of more than one interpretation. First, that it shows that states didn't actually have a constitutional right, which, as we've pointed out, does not fit with how the Supreme Court has talked about state sovereign immunity and the need for consent at the founding. And second, and I think this is very important, it shows that states often are not going to be asserting immunity in these cases. States are allowed to make case by case calls about when to assert it. And so we wouldn't worry. This wasn't a case by case call. Their argument is you guys never said anything about this case after case after case. I take their, they'll speak for themselves, but I take their argument to be something along these lines. There's, you know, longstanding tradition has some meaning when you're trying to figure out what a constitutional provision means. And your longstanding position was we're subject to suit in these condemnation cases. This is very different from the Supreme Court's analysis in cases like Noel Canning and other ones that relied on this sort of practice to inform constitutional provisions. In those cases, it was often internal separation of powers between how the legislature and the executive branch were going to work it out. This is about whether or not states maintain a certain right under basic principles of 11th Amendment and federalism. And what the court has said in that context is that states only lose their sovereign immunity if they gave it up at the founding. I see your point. We're not saying that Europe is stopped or that history has changed matters, but I took the thrust of Judge Jordan's question. He can speak for himself. What I'm interested in, at least in what he's asked, is no one articulated this argument or line of reasoning before. There's almost no case law on it. And I would take one of the strong arguments for your opponents to be if it's this novel, how can it have been so obvious from the plan of the founding? I mean, you know, it was clear Chisholm versus Georgia. People had decided views on what the 11th Amendment meant then and swift reaction to that case. But there's no antecedent to this claim. I don't think it's been asserted before the district court case in Texas, right? So we have the district court case in Texas, and then we have Connecticut having asserted it once before FERC. But those are the two assertions that the parties have pointed to in this case. It's absolutely not asserted with any frequency. I'll grant you that. I would point out this doesn't happen. Stop there. With any frequency, twice. Correct. In a few hundred years. So, well, okay, I've been building pipelines for that long, but why isn't that meaningful? So I think that's actually really important, the distinction between since 1947 or for a few hundred years. There is no history that dates back to the founding of allowing this sort of practice. So I think that actually is a meaningful difference embedded in your question. And in this case in particular, you can imagine that it won't actually have to come up all that often, because you're going to need a situation in which the state views there being a particular problem with the pipeline, and the states and the private party are not able to work out the important questions that come up in these condemnation actions. And there are important questions that are coming up in condemnation lawsuits, like when to file the action, how much to offer in just compensation. And in each of those questions, it matters to New Jersey who's answering them. Well, it also seems to be coming up, or at least the argument coming from Penn East and from the amicus on their side, is that this interpretation would allow a state to aggressively claim interests in land, acquire easements for the very purpose of a laudatory, perhaps in some people's eyes, environmentally protective interest in preserving land, but to the frustration of the overriding purpose of Congress in the passing of the Natural Gas Act. What is the response to that, that this allows, in essence, a veto, and that that could be used aggressively to frustrate a very important congressional purpose? Our response is that the premise is wrong. We are not looking for a veto, and I think we stress this point repeatedly in the reply brief, so I don't mean to rehash, but our basic principle is all that matters is who is filing these condemnation actions. I may have said that wrong. Subjectively, it really doesn't matter whether New Jersey is trying to do that here. Their argument is, if you let them do that here, that will give states a veto, whether you're doing it in this case or not, that it will allow states to say, okay, let's stop these evil pipelines from coming through. We're going to take easements in every meaningful spot, and then they can't ever sue. What's the response? So the response is the premise is still wrong because it has nothing to do with the state's intent, but actually the consequences of us asserting sovereign immunity here. So the consequence of our immunity is not that this land can never be condemned. It just affects who is the entity that needs to engage in the condemnation. You posit no problem with the federal government condemning every parcel along the certificate or necessity line that is approved, taking title itself and then reselling. Your objection is solely to this being brought by pennies. That's exactly right, Judge Bibas. That is the difference between what we say should happen and what is actually happening in this case. Can you respond to the argument Penny has made that you're standing in the same position as Oklahoma was in the Guy Atkinson case? Land condemnation, the government, the Supreme Court there said the state couldn't assert this kind of interest. So if you read footnote two of that opinion, the Supreme Court is indicating that the condemnation there actually was by attorneys for the government. So in our view, Atkinson shows exactly what should happen here. And there are already statutes in other contexts that allow for condemnation by attorneys for the government. So it doesn't matter. Your assertion is it doesn't matter who the party is. It's who the lawyer is. No, no, I'm sorry. It was attorneys for the government as the government doing condemnation. And then a private contractor was working to construct the dam with the government. So that looks much more like what Judge Kivas was positing, which is you would have the federal government through DOJ engaging in condemnation actions. And then they could grant the land, whether through sale or whatever arrangement they would set up to the private entity that is going to engage in the construction. I would just point out there is a statute that does what we're talking about. It's 16 U.S.C. 824 A-4. And it's a particular arrangement that already allows for condemnation of electricity transmission sites. Do you want to run that again? Yes, of course. Is that in your brief? It's not. This one is not in my brief. Okay, give it again. It's 16 U.S.C. 824 A-4. And we're not making any sort of reasoning argument. Our point is there are examples of where Congress is properly doing what we're describing, which is to say the Department of Energy is able to engage in condemnation for electricity transmission. And then what it's able to do after that is sell to the permittee for that electricity transmission along the Canadian border, specifically what it paid for, including administrative costs. So the federal government is just as well off as it was originally. It's simply the one that had to actually engage in the condemnation. So the state's rights to only be sued by the federal government to who they consented is preserved. While at the same time, the substantive rights that pennies have to move forward with the pipeline would also be preserved. What does that formalism gain us if we make the government jump through those hoops? So we don't think that it's a formalism because in this case, as in any other, there's a meaningful difference between who is on the other end of the litigation, not just who is on the other end of the substantive right. And so in this litigation, and that's why I teased out the important questions that still need to be answered, you could imagine the federal government and a private party answering very differently the question, when to file these condemnation actions. So there's still an ongoing challenge to the FERC certificate in the D.C. Circuit. And obviously, if the D.C. Circuit rules a certain way on the certificate, then the pipeline needs to be reconsidered by FERC altogether. So is this a premature lawsuit? Should we talk about this at all if it's still up in the air, whether there's even going to be a sound certificate of necessity? So if this court wishes to hold it to see what the D.C. Circuit does, it's perfectly free to do so as a matter of its own practice. But jurisdictionally, Penney's was free to move forward based on the language of the certificate. And we haven't raised a challenge in this case to the mere fact, on appeal, that it's still ongoing. Our point is just – Can you respond in the time you've got here to something that is – The Senate report from 1947, they say, means that the express purpose of the amendment to the Natural Gas Act was to correct the deficiency in emission in the act that states were standing in the way of condemnations. What's your answer to that? Our answer is, I think, the same as my colloquy which Judge Bebas showed, which is we're not looking for a veto here. And so the legislative history which said we don't want state vetoes isn't applicable because we're not asking for a veto here, whether it's a matter of intent or consequences. We're just suggesting a different entity needs to follow the action. It doesn't seem to meet the argument. Their argument is, no, Congress meant for the Natural Gas Act to do this. And they meant it because they said so in this report. We mean for these amendments to say, in fact, condemnations are supposed to happen and they're supposed to happen in the ordinary course of the Natural Gas Act, which means pipelines can do it. That's what I take their argument to be. Meet that, would you? Go ahead, answer. So what they're saying is that's why they have the power of eminent domain. But that doesn't say anything about whether, at the same time, that would take away the state's right to have sovereign immunity. And so it's not the unequivocal textual evidence that you would need because it's in legislative history. But even the legislative history itself does not talk about state lands, sovereign immunity, the 11th Amendment, and the like. Could you tell me what your response is to the key 10 point that your adversaries raised? I mean, our circuit hasn't spoken specifically on it. Is it that, in fact, key 10s are not permissible at all or that they're distinguishable or both of those things? So first, obviously, the Supreme Court has spoken to this issue directly and in Stevens doubted the permissibility of key 10 actions against states as a constitutional issue. It's not a holding. They construed that statute. Absolutely. They just simply said the background principle for why they construed it that way was the doubt that it would even be valid constitutionally. But in any event, the motivating analysis that led to the split among the circuits on the key 10 issue was whether or not the United States was the real party in interest in those lawsuits, not whether or not the United States could delegate its power. And the reason the U.S. was held in certain circuits to be the real party in interest was specifically because the suit was in the United States' name. Recovery would go largely to the U.S. The U.S. could exercise certain forms of control and intervention in the lawsuit. And so insofar as that case was hard because of all of those factors, this case is easy because Penn East, as everyone agrees, is the real party in interest here. I've got one more question, which is about let's say we get to the argument about whether or not there were offers made for the parcels. We don't really have clear briefing on the parcel-by-parcel analysis on which parcels there was actually some monetary offer made to the state or not. Where would you direct us to look for that? Are there particular places in the record, or would we need to ask you for supplemental briefing? Sure. So I think the pages that I would highlight in the record primarily are for DEP, our Department of Environmental Protection, JA97 and 101, and for our Agriculture Committee, JA110 and 116. But I would also note that insofar as this court is inclined to recognize that owner of property can include property interest, then the proper course is simply to remand for the district court to go parcel-by-parcel and make the appropriate fact-finding, because there is a fact dispute on that question. Okay. Thank you, Mr. Feigenbaum. We'll have you back on – well, actually, just a moment. Judge Nygaard, do you have any questions? No. Thank you, Judge Arden. All of my questions have been asked and answered. All right. Thank you. Thank you, Your Honor. We'll have you back on rebuttal. Good afternoon, Your Honors. May it please the Court. James Graziano, Barcher & Griner on behalf of the Pele Penneys. This is a very unique situation in that four factors exist here that are not present in any of the cases on which the State relies. This is a limited interstate federal project. This is for a public purpose. The federal government exercises continuing oversight and control of the project, and the State has avenues in which it can challenge the federal government's decisions and hold it accountable. Okay. That's all – yeah, you've made those points very clearly in your briefing. But I would like you to respond to the opening paragraph in the State's reply brief, wherein they say – look, you just – I'm not paraphrasing. You're just not answering the question, right? And the recitation you've given us, I would wager Mr. Feigenbaum, who is still at the podium, would say that's just nonresponsive. The question isn't whether the federal government is involved in approving your pipeline, and the question isn't whether you've got some good purpose here that Congress approves. The question isn't even whether you, Penn East, have a delegated power to exercise eminent domain. The question is whether you've got a power to exercise eminent domain against a sovereign, a sovereign State, that that's a separate power that the United States has, and it has not been delegated, and it hasn't – and it indeed couldn't be delegated. It would have to be abrogated by the United States government, and that hasn't happened. I take that to be their central argument and one that I would like to hear you come to grips with, because all those things you just said, they don't amount to abrogation, right? You're correct. Okay. So if you acknowledge that what has happened here in the Natural Gas Act is not an abrogation, then your argument has to come down to the federal government can delegate the power to override the 11th Amendment through something like a Natural Gas Act enactment. Is that right? Correct, Your Honor, but I think the – Then answer their question, which is – and their amici's question, which is not a word is spoken about delegating that. There's not boo said in anything in the Natural Gas Act that explicitly or impliedly says you can override state sovereign immunity, and that is kind of deaf to your program. Your Honor, I'm not sure that I agree with that proposition. With due respect, I think that the Natural Gas Act specifically states that for all properties necessary for the project. Can you please direct us? Are we in 15 U.S.C. 717F? Yes, Your Honor. Okay. I've got it up. Subparagraph H? Correct. Okay. Where? It says all properties necessary for the project. Okay. I'm looking at it right now. Cannot acquire – where are you looking at all properties necessary? It says the property interest necessary for the project. Cannot acquire the necessary right of way? Right. Yes. Okay. It doesn't say – Necessary by implication covers all necessary properties. So it doesn't say all property, right? It says necessary property. Right. And it doesn't – And in this – It doesn't say state properties. It says nothing about state owners. It's not. It says necessary properties, and states owned properties back then, that was known. Well, but there are lots and lots of laws that make employers liable for discrimination, for example, and yet 11th Amendment immunity, you know, we – places like Atascadero, Pennhurst, say we're not going to construe those as reaching the state unless there's something really clear. We'll avoid reading necessary or employer to the full extent of its dictionary meaning unless it comes out and tells us something. And I agree with that, but the starting position in those cases is that the state has fundamental 11th Amendment immunity, and the federal government by statute is attempting to take that away and let any private actor file any suit that they want under that statute, whereas here – There can be – nobody's questioning that there can be abrogation, right? But you've just acknowledged that what we're dealing with here is not an abrogation, that there isn't the kind of unmistakable clarity that would amount to an abrogation, or did I misunderstand? No, I – what I'm saying is the starting point for this is, as the state admits, the federal government has the authority to undertake this project and acquire the properties, and what it has done here is it has made the natural gas company its agent for purposes of doing that. Yeah, and their point – right. That's – I – right, I absolutely understand that's your argument. And their argument is no, Congress didn't do that, and they couldn't do that, right? That that is in the very nature – that's the Blatchford case. This is exactly the Blatchford case. You say, oh, that's so distinguishable, it is useless by analogy. But I don't think you can just wave your hand over that, Mr. Graziano, and make it go away. And Blatchford, the court said very clearly, you know, we doubt you could have a delegation. Abrogation, yes. We doubt you could have an abrogation – a delegation. But even if you could, this thing at issue in Blatchford doesn't do it. So why, in the face of that kind of language in Blatchford, do you think that, you know, the Supreme Court's doubts about delegation are not well founded? Because, Your Honor, I think those doubts arose in very different situations. I think they arose in situations where any private party could go and file the claim as it chose, prosecute the claim as it chose, whereas under the Natural Gas Act, by the time it's time for the natural gas company to file the actions, the federal government has reviewed the project and said, these are the – Hold on. Blatchford – stick with me. Blatchford wasn't about any private entity. Unless I'm misremembering the case, wasn't that a Native American tribe? It was, but it was a – Okay. It was a very specific thing. And they had at least the argument that they were sovereign, too. They came in and said, hey, we're sovereigns, too. Indeed. Penn East may be a wonderful organization, but to my knowledge, they haven't claimed sovereignty. And in that context, the Supreme Court said, speaking to another sovereign, a sovereign tribe, look, we doubt you could even have a delegation. One of the factors involved there was that the reverse also was not true, that the state also could not sue the Native American tribe. So there was a balance. Why is that relevant here to the question before us? How does that assertion speak to the issue before us, which is there's no such thing as delegating the authority of the United States to haul a sovereign state into court? Twofold.  And I apologize, but I thought that you were asking why we would say Blatchford wouldn't apply. And I was trying to answer that. Second, I'm sorry. I think you have to show more than that Blatchford doesn't apply as an 11th Amendment matter. Under the canon of constitutional avoidance, you have to show there's no serious constitutional question. And I don't know how you can show that. Look, Blatchford is dicta, but they're persuasive and well-reasoned dicta. Shouldn't we at the very least shy away from testing the outer boundaries of this ability to delegate, you know, the power to puncture a state's sovereignty? Your Honor, again, I don't think that that's at issue. I think this is so narrow just for this particular situation under the Natural Gas Act, which, as Your Honors have already stated, was in place for 80 years, working just fine, condemning properties in which the state had an interest. Because one of the main concerns under those cases and why they doubt the delegation is that the state has no federal official to hold accountable. And here the state has avenues. I'm not sure what you're looking at when you say that's what was going on there in the cases like Blatchford or like Delmuth or Tennessee Street. I'm not sure that anybody said, hey, we're worried that there aren't federal officials involved. When I was reading those cases, in particular, Blatchford seemed to speak most directly to this. The court just said, in essence, there's a way that this can happen, that is, the state's sovereign immunity under the 11th Amendment can be stripped, and that's abrogation. That's the way it happens. Now, what law are you relying on that says, in addition to abrogation, there's delegation, and that's a sound principle on which to strip state sovereign immunity under the 11th Amendment? I do think that the Keatom cases are instructive because they actually meet three of the four points we've presented to the court so far. Well, what's the answer to what Mr. Feigenbaum was saying, which is those cases, the split was not about whether a private individual could abrogate state sovereign immunity. The question in those cases was whether the federal government was actually the actor, and indeed the dispute was, does saying United States ex-rel mean the United States is the party? I think if you read the cases, what they stand for, the proposition is the fact that the federal government had control over specific lawsuits, that the Keatom plaintiffs have to file their complaint under seal for 60 days to allow the federal government then either to intervene and prosecute the case itself or to allow the Keatomer later to move forward with the case. But in any event, the federal government's not out of the picture then. Right. Well, Steve, I mean, Stevens suggested that they saw real, the court was nervous enough and uncomfortable enough that it shied away from pushing that. On your logic, there should have been no problem then, and the Keatom should have been allowed to proceed. And why did it give the court pause then? Because the court went a different direction in Stevens and what the definition of a person was under the False Claims Act. And it used statutory construction both of looking at the whole False Claims Act as an entire statute and sister statutes to identify that person as defined for purposes of filing a suit did not include the state because when they wanted to include the state in other sections, they did. But this is the same move that the court makes in cases like Atascadero and Penhurst that when it's nervous about whether a statute ought to reach states or not, it construes that term person narrowly in order to avoid pushing the constitutional envelope. This doesn't use person, Your Honor. And if we look at sister statutes like the Federal Power Act, when they wanted to carve the state out, they specifically did carve the state out. They said prior to October of 1992, you can't condemn parkland owned by a state. If you could not condemn any land owned by a state, that would be surplusage and unnecessary. I thought the amicus in this Canaan Center's brief on that explained that this is in the eight years after Union Gas when they thought that there was a power to abrogate under the Commerce Clause. It's just, you know, that's why that's worded then. And this statute from 1947 is before, you know, that brief window when people thought you could abrogate against the state under the Commerce Clause. I disagree because it still had implicit in it and said when they were doing it, the reason we're doing this is because inherent in the language of this statute is that you can condemn state property. That doesn't answer the question. The question that's being put to you is this Canaan Center brief says from pages 12 to 16 in that brief, it's true that the Federal Power Act and the Amtrak Act may have said that or words to those effects. But that came during a brief interregnum when there was some question about the capacity to do something. That might have been thrown into doubt by Supreme Court authority. But that gap no longer exists. Except there had been no doubt prior to that period because under the Federal Power Act and under the Natural Gas Act, state properties had been being condemned. That's maybe we're just talking past each other. When you say there had been no doubt, I mean, you can take issue with their premise that Congress is reading the Supreme Court's opinions and saying, okay, now there's doubt and we have to deal with it and then they stop. I mean, I guess you can argue with that. But their assertion is you get no traction from the Federal Power Act and the Amtrak Act because that existed in a period of time between Supreme Court authority that may have cast doubt on the ability or made it sound like Congress could do something like delegating and then a later case where they made it clear you couldn't. So the fact that language was put in there by congressional folk in that period of time doesn't tell us anything about the Constitution. It tells us something about Supreme Court precedent and questions. That's what I understand them to be saying. Do you have a response to that history lesson? Your Honor, the Federal Power Act was amended pursuant to National Environmental Policy Act. It wasn't amended pursuant to concerns over the Eleventh Amendment. It was because they once stopped the ability or narrowed the ability to build federal power plants on state-owned parkland. And that was the context in which it was amended. Okay. Well, getting down to the last little bit here, and I won't cut off either of my colleagues here if they have additional questions, but I just want to run through a couple of things to make sure I've understood your argument, both in the briefing here today. You're acknowledging that what happened in the Natural Gas Act, whatever it is, was not an abrogation of the Eleventh Amendment immunity, right? Correct. Okay. Because it doesn't achieve that unmistakable clarity that we would require for abrogation, correct? Your Honor, I do believe that it is clear, but I don't think that it's useful because it's a delegation instead of an abrogation. Well, if it was unmistakably clear, why wouldn't it just be an abrogation? Because it starts from a different point. It starts from the power of the federal government to undertake the act, and for a specific project to designate an agent to do certain activities the federal government isn't going to do, like an alternatives analysis, like an environmental impact statement, like the actual physical construction. Well, then maybe I'm not as clear on your argument as I thought I was. What do you think is unmistakably clear about the intent to override state sovereign immunity? And please don't tell me about the right of eminent domain, because their argument is those are two separate rights. They're not the same right. So talk about eminent domain doesn't move the sovereign immunity ball at all. Speak to the sovereign immunity piece of this. Is there something in the Natural Gas Act that says clearly and unmistakably and explicitly in the way that an abrogation would do it, and we're overriding the state's 11th Amendment sovereign immunity? No, Your Honor, not in that language. Okay. All right. Do you have any? Just the same question I asked your opponent. If we get to this issue about whether, in fact, offers to buy were made, do we remand the district court to do the parcel-by-parcel analysis? Your Honor, you certainly could. That's within your authority. However, I don't think you have to, because one of the things that the state tends to gloss over, and it's a reply brief. It sort of drastically narrows that to say we didn't apply appraisal-backed offers. They haven't cited a case that says that we're required to. But if Your Honor's looked at JA-159 through JA-173, you will see that Penney's made numerous attempts to work with the state to acquire these property interests, and then the state shut down negotiations. I understand you made numerous back-and-forth discussions, but if we come to the conclusion that it depends on making some kind of dollar-value offer for parcels, is there an easy answer in the record for all 42 parcels, or is this something that requires remand? I think if you look at that section of the record again, you could say that while there did not come down to a dollar offer, it's irrelevant because the state refused to engage in any discussions. That's a legal question we have to answer. But if we get past that question, you would then say we have to. Yes, Your Honor, you have the right to do that. Okay. Judge Nygaard, nothing I take it from you in the way of further questioning, sir? I have no questions. Thank you. All right. Thank you, Mr. Graziano. Mr. Feigenbaum, we'll have you back on rebuttal. Before I get into two final points, I just wanted to answer Your Honor's question about why Penny's might not be arguing that in this case there was an abrogation. It's because the NGA was adopted pursuant to the Commerce Clause, and Congress doesn't have authority to abrogate state sovereign immunity when it's acting pursuant to the Commerce Clause. So that's why they've had to shift it into the delegation framework. And we say that's a workaround around abrogation. That doesn't work. But that explains why, just to finish up that colloquy, they can't move forward under abrogation. There were just a few points that we wanted to make on rebuttal. The first is, obviously, there was a lot of discussion earlier today about the practice under the NGA, especially since 1947. And first, I understand courts haven't been speaking to this issue, and there really is a dearth of case law here, but no court has ever blessed this either. And so insofar as this court is going to say the NGA does reflect such a delegation and that Congress could have followed such a delegation, it would essentially be going out on a limb and adopting a theory that no court has adopted to date. And in terms of just practice on its own terms, it's worth noting that this really is an area that uniquely is less driven by some of the subsequent practice. So you could see that we were talking about Seminole Tribe and how it overruled Union Gas. There was obviously practice in the era after Union Gas, pursuant to Union Gas, that it would have allowed for abrogation under the Commerce Clause, but that was not enough for the court to say that states had consented to such abrogations. Your response to the argument by Mr. Graziano that this has nothing to do with Union Gas or any other state Supreme Court case, this language in the Federal Power Act and Amtrak Act, they reflect an understanding that things can be delegated. This type of power can be delegated. And then in the case of the Federal Power Act, they were responding to the National Environmental Policy Act. So two responses to that. The first is that if they were acting in the Union Gas area in that era, that would have been correct because during that time period, the court had held Congress did have the power to abrogate state sovereign immunity. And so whether you called it a delegation or an abrogation, they would have been right to say that some of this could have moved forward. Seminole Tribe has corrected the misunderstanding that Union Gas espoused. And so whatever Congress understood about its power in that short eight-year window says nothing about what Congress's power actually is as a matter of delegation and as a matter of state consent at the founding. I'd also like to point out that this court's recent decision in Franchise Tax Board v. Hyatt, which overruled a decades-old decision in Nevada v. Hall, also wouldn't have made any sense if the mere practice after Nevada v. Hall could control state sovereign immunity. Instead, they went back to the founding  to these sorts of abrogations in other states' courts, and as a result, they had not given up their state sovereign immunity. So that type of analysis just doesn't give this court sort of an end-run around the normal principles of sovereign immunity. You mentioned, and we'll look at this Electrical Act, 16 U.S.C. 824-A-4. Do you have any evidence about practice under that law or any other laws? Do you have any way of knowing how much of a disruption this would be ruling for the state here and what would be the first appellate decision to hold the 11th Amendment barred this, how that winds up disrupting or not disrupting the condemnation of electric sites or some other analogous utility eminent domain situation? I see my time has expired if I may answer briefly. Please. So the DOJ, ENRD, the Environment and Natural Resource Division, has a land acquisition section that, to this day, continues to engage in condemnation. So in that particular context, it continues to work in the expansion of certain national parks in the need to condemn for certain federal buildings, whether the federal buildings are growing or they're building a new post office. So it's not as though the federal government is not currently engaged in condemnation. The point that Penn East and that Tamieki were making is that it's not engaged in condemnation under the Natural Gas Act. But that doesn't mean that it can't, and in other contexts, doesn't actually engage in condemnation. And we say that's exactly, as a matter of statutory interpretation and constitutional law, what needs to happen here. All right. Thank you very much. We appreciate argument from both sides. We've got the matter under advisement. We'll recess court.